573 A.2d 397

**John Robert TIMMS**

v.

**STATE of Maryland.**

**No. 1336, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

May 10, 1990.

Mark Van Bavel (Walker & Van Bavel, on the brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before BISHOP, BLOOM and ROBERT M. BELL, JJ.

ROBERT M. BELL, Judge.

John Robert Timms, appellant, was arrested and charged with possession of cocaine and possession of heroin. He moved, pretrial, to suppress the evidence seized when he was arrested. That motion having been heard and denied, he proceeded to trial, before the court, in the Circuit Court for Baltimore City, on a not guilty plea upon an agreed statement of facts. The court found him guilty of both

charges and imposed sentence. On appeal, he presents a single question: "Whether the trial court erred in denying appellant's motion to suppress."

The facts pertinent to the resolution of this case were established at the hearing on the motion to suppress, through the testimony of one of the two arresting officers. His testimony, which was accepted by the court, was as follows. At approximately 5:30 a.m. on the morning of November 28, 1988, he (Officer Junta) and Officer O'Donnell were patrolling the area of the 2100 block of Division Street in Baltimore City, a designated drug-free zone.[1] They were dressed in plain clothes and traveling in an unmarked police car. Upon reaching the 500 block of Gold Street, they observed two men, appellant and an unidentified man, standing in the middle of an alley. The two men "seemed to be in some kind of conversation."

Proceeding around the block, to the other end of the alley, the officers left their car and went "to the top of the alley." They then identified themselves by shouting "Police." Thereafter,

> The unidentified male ran. The defendant followed, but not really in a quick run. It was like a jogging, just to get out of the alley. We went through the alley and followed him. Like I said, it was hard to get through the alley. It was a bunch of garbage in the alley. When we came out of the alley, the defendant was walking down Division Street. The other person was out of sight. At that time, myself and Officer O'Donnell noticed the defendant carrying a white ziplock bag. But we didn't know it

---

1. Pursuant to Baltimore City Ordinance No. 375, effective July 11, 1989, it is unlawful for a person to loiter in a public place in order to engage in drug-related crimes. In determining whether such a crime is in progress, police are to consider the totality of the circumstances, one of which, by way of example, is fleeing, without any apparent reason, upon an officer's arrival. Moreover, the absence of an apparent reason for being in the drug-free zone, *i.e.*, waiting for a bus, being near one's residence, are other factors which an officer may take into consideration.

The validity of this ordinance is not an issue on this appeal.

was a ziplock bag at that time. It was a white bag sticking out of his hand at each end. You could tell there was a white substance inside the bag. Well, through my training and experience, I believed it to be heroin or cocaine. So we stopped the defendant and at which time, we recovered the bag from his hand. The bag had the word boy [2] written on it.

They also seized another ziplock bag from appellant's person. Chemical analysis confirmed that the bags contained controlled dangerous substances: in one bag, cocaine, and in the other, heroin.

"Ruling on the motion to suppress, the trial court said: This officer's testimony, which is accepted by the parties, is that the defendant was in an alley with another man. The police officer from 30 yards away yelled to them police. One ran at a fast clip. The other ran at a much slower pace. The officer never took control of the person of these individuals until after he had gotten out of the alley. Even upon exiting the alley, he didn't take physical control of anyone. As he approached the defendant, as he indicated in his testimony that he observed a bag of white powder protruding from his hand. We have the confluence of that with the testimony that this was a high narcotics area. The officer's seizure of the person of the defendant occurred after he had made a visual observation of a suspicious object in the hand of the defendant."

The foregoing makes clear that the court believed that, to constitute a seizure, the officer had to "take" physical control of appellant.

Subsequent to this decision, the Court of Appeals decided *State v. Lemmon*, 318 Md. 365, 568 A.2d 48 (1990). There, the Court addressed two questions, namely:

In light of *Brower v. Inyo County* [—— U.S. ——], 109 S.Ct. 1378 [103 L.Ed.2d 628] (1989), did the Court of Special Appeals err in ruling that Lemmon was "seized"

---

2. "Boy", the officer testified, is a street term for heroin.

for purposes of the Fourth Amendment when chased by police officers?, and

In light of *United States v. Sokolow* [489 U.S. 593], 109 S.Ct. 1581 [104 L.Ed.2d 1] (1989), did the Court of Special Appeals err in concluding that the "seizure" of Lemmon was not supported by sufficient articulable suspicion?

318 Md. at 368, 568 A.2d 48.

As in the instant case, the pertinent facts in *Lemmon* were developed during the suppression hearing. There, according to the police testimony, which the trial court credited, on the day Lemmon was arrested, three police officers were on patrol in Baltimore City, in plain clothes and an unmarked police car. A call reporting a narcotics violation in progress at a specified location, came over police radio. The source of this information was never identified. On arrival at the specified location, two of the officers got out of the car and approached Lemmon and another man. One officer, having identified himself as a police officer, asked the men to "come here." Lemmon ran, and the officers pursued him. The third officer followed in the car, with which he unsuccessfully tried to block Lemmon's escape. At some point, Lemmon took a "medicine type vial" from his pocket and tried, unsuccessfully, to force it through a chain link fence. *Id.*, 318 Md. at 370, 568 A.2d 48. He was eventually caught and detained while the officer retrieved the vial. Upon recovery, the officer concluded, based on his expertise, that the vial contained 44 valiums. Lemmon was then "arrested". Later testing confirmed that the vial contained valiums.

The Court held that a Fourth Amendment seizure of Lemmon occurred when the officers ordered him to "come here." *Id.*, 318 [Md.] at 374, 568 A.2d 48. It relied upon *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). In that case, the Supreme Court articulated the test to be used in determining whether a person has been "seized" within the meaning of the Fourth Amendment:

... the police can be said to have seized an individual "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (Citation omitted)

486 U.S. at 573, 108 S.Ct. at 1979. The Court of Appeals found significant that the *Chesternut* Court rejected both the rule espoused by the State—"that a lack of objective and particularized suspicion would not poison police conduct, no matter how coercive as long as the police did not succeed in actually apprehending the individual", (486 U.S. at 572, 108 S.Ct. at 1979)—as well as that favored by *Chesternut*—"that the police may never pursue an individual absent a particularized and objective basis for suspecting that he is engaged in criminal activity" (*Id.*). 318 Md. at 372–73, 568 A.2d 48. It also reiterated the observation by the Supreme Court that:

The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

*Id.*

Finally, the Court summarized the facts it considered dispositive of the seizure issue:

The approach by two officers, the command to 'Come Here,' the immediate pursuit by the officers when Lemmon ran, the attempt to set up a blockade with the police car when it was apparent that Lemmon was getting away, the joinder of the third officer in the posse, leaving the police car unattended, the attempt by one of the pursuers to circumvent a possible line of flight-all of these measures were amply sufficient to communicate to the reasonable person an attempt to capture or otherwise intrude upon freedom of movement. The aggressive actions of the police would cause the reasonable person to

believe that the police objective in the pursuit was to restrain his liberty, not merely to be afforded the opportunity to talk to him. We find it clear that the conduct of the police was so intimidating in the circumstances that Lemmon could reasonably have believed that he was not free to disregard the police presence and go about his business.

*Id.*, 318 Md. at 374, 568 A.2d 48.

Addressing the first certiorari question, the Court rejected the State's argument that *Brower v. County of Inyo*,[3] *supra*, held, refining *Chesternut*, that the fourth amendment is not implicated until the police have intentionally acquired physical control of the defendant.[4] 318 Md. at 374, 568 A.2d 48. On the contrary, it found the cases compatible. In that regard, the Court said:

The Court noted that whenever an officer restrains the freedom of a person to walk away, he has seized that person.... In the light of the opinion as a whole, we do not construe this to mean there must be an actual taking of the person; there may be a *constructive* restraint of the freedom to walk away. A significant part of the Court's opinion was with respect to the *intentional* acquisition of physical control as a characteristic of a seizure, as distinguished from *accidental* or *unintentional* control.... Any implication that *actual* physical control is required must be read in the frame of reference of the Court's concern with that characteristic. We do not see in the Court's declaration, even if not dicta, that "[v]iolation of the Fourth Amendment requires an intentional

---

3. Factually, Brower involved a roadblock set up to stop the accused, as to which the Court observed:

[A] roadblock is not just a significant show of authority to induce a voluntary stop, but is designed to produce a stop by physical impact if voluntary compliance does not occur.
109 S.Ct. at 1382.

4. In the instant case, the State makes the same contention. It argues: "the majority's opinion [in *Brower*] authored by Justice Scalia, provided a new definition of a seizure: 'Violation of the Fourth Amendment requires an intentional acquisition of physical control.'"

acquisition of physical control,"... that there must be an actual laying on of hands and a taking of the person. The declaration goes no further than the notion that a governmental termination of freedom of movement must be through means intentionally applied.... In short, we believe that *Brower* is in no way inconsistent with *Chesternut* and leaves the *Chesternut* test intact in all material aspects. (Emphasis in original, citations omitted)

318 Md. at 375, 568 A.2d 48.

■ Appellant argues "that the encounter by the police officers was either a 'seizure' or an 'arrest' for constitutional purposes *as of the time that police officers shouted 'Police' at Appellant when Appellant was in the alley."* (emphasis in original) [5] Therefore, he continues, the seizure can only be upheld if, at the time appellant was seized, the officers could point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the intrusion." *State v. Lemmon,* 318 Md. at 380, 568 A.2d 48.[6] *See also Jones v. State,* 319 Md. 279, 572 A.2d 169 (1990). The State, on the other hand, contends that the seizure occurred after the police officers observed the contraband in appellant's hand and then obtained physical control of him.

■ Because appellant is alleging violation of a constitutionally protected right, we are required to make an independent constitutional review of the entire record. *Parker v. State,* 66 Md.App. 1, 10, 502 A.2d 510, *cert. denied,* 306 Md. 70, 507 A.2d 184 (1986); *Borgen v. State,* 58 Md.App. 61, 77, 472 A.2d 114, *cert. denied,* 300 Md. 483, 479 A.2d 372 (1984). Moreover, we must give great weight to the trial judge's first-level factfinding. *Parker,* 66 Md.

---

**5.** We do not consider whether this conduct constituted an "arrest", as that is not an argument appellant made below. *See* Md.Rule 8–131(a).

**6.** During oral argument, appellant also argued that the trial court applied the wrong standard, *i.e.,* that the seizure occurred only after the officer's obtained physical control. This, he states, at the least warrants remand of the case.

App. at 10, 502 A.2d 510; *Borgen*, 58 Md.App. at 79, 472 A.2d 114. We are not required, however, to defer with respect to the second-level factual conclusions; we must resolve for ourselves what conclusions are to be drawn from the first-level facts. *Parker*, 66 Md.App. at 12, 502 A.2d 510.

The facts *sub judice*, while similar to those in *Lemmon* to some degree, do not reveal the type of aggressive conduct present in that case. Here, unlike in Lemmon, the officers, in a loud voice, identified themselves as police officers; they did not, in words, instruct appellant to "come here" or otherwise indicate that they intended to stop him. As in *Lemmon*, however, when appellant fled, the police pursued him. Of course, the chase in this case was not as prolonged or involved as was the chase in *Lemmon;* there was no occasion for the employment of the aggressive measures employed in *Lemmon*. Moreover, Lemmon discarded a pill vial while appellant apparently held onto his stash. In *Lemmon*, the accused was arrested once the vial was recovered and the officers determined that it contained contraband; here, appellant was arrested subsequent to the officers observing, in his possession, a ziplock bag with a white substance, which they determined, using their expertise, to be either heroin or cocaine. Finally, in this case, the police testified that their intent when they identified themselves as officers was to stop appellant for investigation.

The question to be resolved is whether the officers' conduct—shouting out their identity to and pursuing appellant and his companion when they fled—constituted a seizure. Only if it were would we be required to analyze whether the officers had a sufficient basis for making the seizure.

The State's argument that appellant was not seized until he was physically taken and charged is premised upon its analysis of *Chesternut*. In *Chesternut*, the police on routine patrol saw a car stop and its occupant approach Chesternut who was standing on a corner. When Chesternut saw the police car approaching the corner where he stood,

he turned and began to run. The police followed him around the corner "to see where he was going" and, because they were in the patrol car, they quickly caught up with Chesternut and drove alongside him for a short distance. As they did so, the officers saw Chesternut "discard a number of packets he pulled from his right-hand pocket". When one of the officers, with experience as a paramedic, retrieved the packets and, based on his experience, "surmised" that the pills in the packet contained cocaine, appellant was arrested. 486 U.S. at 569. A subsequent search uncovered other contraband and a hypodermic needle. On these facts and notwithstanding the reference, by one of the officers, to the police conduct as a "chase" the court determined that Chesternut had not been seized prior to his discard of the packets. On the contrary, it held:

> the police conduct involved here would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon respondent's freedom of movement. The record does not reflect that the police activated a siren or flashers; or that they commanded respondent to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block respondent's course or otherwise control the direction or speed of his movement.... While the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of police presence does not, standing alone, constitute a seizure. (Footnote and citations omitted)

486 U.S. at 575, 108 S.Ct. at 1980. The court expressly did not determine "the circumstances in which police pursuit could amount to a seizure under the Fourth Amendment." *Id.*, 486 U.S. at 575–76 n. 9, 108 S.Ct. at 1980 n. 9.

The case *sub judice* is different from *Chesternut*. In addition to approaching appellant and his companion and identifying themselves as police officers, when appellant and his companion ran, the police pursued them. That is a far cry from following a person to see where that person is going. Indeed, it is consistent with what the officer testi-

fied was his intent: to stop appellant.[7] We hold that viewed in their totality, the circumstances were such that a reasonable person would not have felt himself or herself free to leave. Consequently, appellant was seized at the point when the police identified themselves as police officers and then pursued appellant when he left the area.

We now inquire whether the seizure was "unreasonable". We do so mindful that, to justify the seizure, the police need to be able "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the intrusion." *Lemmon*, 318 Md. at 380, 568 A.2d 48. Moreover,

"We approach the determination ... by giving due consideration to the tenet that we must look to the totality of the circumstances—the whole picture. We do so in light of the facts and circumstances found to be credible by the trial judge. We are mindful that we are dealing with probabilities, not certainties. In our consideration of the totalities of the circumstances, we factor in the variables of the information leading to police action, the environment, the police purpose, and the suspect's conduct."

*Lemmon*, 318 Md. at 379, 568 A.2d 48.[8]

On direct examination, Officer Junta testified as to why he and his partner decided to stop and investigate when they saw appellant and another in the alley:

---

**7.** To be sure, in the absence of a communication of that intent to a person confronted, an officer's subjective intent is irrelevant. *See Chesternut*, 486 U.S. at 575 n. 7, 108 S.Ct. at 1980 n. 7. The communication of that intent need not be verbal however. It may be, as we hold it was in this case, communicated by the actions of the police in chasing appellant.

**8.** As the Court made clear, this is consistent with *United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the case referred to in this second certiorari question, upon analysis of which, the Court concluded that, rather than providing new guidelines regarding stops pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), it merely affirmed its teachings.

A. Well, being the time of night it was, 5:30 in the morning, and the kind of trouble we get around there, being a lot of B & E calls—

\* \* \* \* \* \*

B & E calls and we get throughtout the night narcotics calls in that area. So we were investigating why they were in the back of the alley 5:30 at night. So I went around on Gold Street.

This testimony, being specific and articulate, we hold, provided the reasonable basis for the seizure. The situation *sub judice* is unlike the situation existing in *Lemmon,* where the police had no more than a tip, which "was basically that something was occurring" without any specifics as to how, or by whom, it was to have occurred. 318 Md. at 379, 568 A.2d 48. Nor is it like *Jones, supra,* in which, though occurring early in the morning, the only activity seen by the police was an innocuous act, a person riding a bicycle with a cleaner's bag over his shoulder. Here, in addition to the early morning hour, the police also knew the nature of the area and the fact that B & E calls were a frequent occurrence. Furthermore, they observed appellant and another *in an alley* engaging in conversation. While what they knew and saw did not provide probable cause for an arrest, in and of itself, viewed in light of the experience of the officers, it provided, at the least, reasonable suspicion. And when the police got close enough to appellant to observe the ziplock bag with a white powder, given their expertise in narcotics investigations, their reasonable suspicions were elevated to probable cause for an arrest.

Accordingly, although we do so for a reason other than that relied upon by the trial court, we conclude that appellant's arrest was proper and the seizure effected as a result thereof, was constitutional.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.